## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA

|  |  |
|---|---|
| DANNY DAY, Jr. FARMS, and DANNY DAY, Jr. & SON FARM PARTNERSHIP,<br><br>        Plaintiffs,<br>v.<br><br>SYNGENTA CROP PROTECTION AG; SYNGENTA CORPORATION; SYNGENTA CROP PROTECTION, LLC; CORTEVA, INC.; BASF SE; BASF CORPORATION; BASF AGRICULTURAL PRODUCTS GROUP; NUTRIEN AG SOLUTIONS, INC., HELENA AGRI-ENTERPRISES, LLC,<br><br>        Defendants. | Case No.:  1:22-cv-02225 |

### CLASS ACTION COMPLAINT

1.      Farmers in the United States have paid and continue to pay inflated prices for crop protection products due to the unlawful conduct of: (1) Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively, "Syngenta"), BASF SE, BASF Corporation and BASF Agricultural Products Group (collectively "BASF"), and Corteva, Inc. ("Corteva") (referred to herein collectively as the "Manufacturer Defendants"); and (2) Co-conspirator Distributor Defendants Nutrien AG Solutions, Inc. ("Nutrien"); and Helena Agri-Enterprises, LLC. ("Helena"); (collectively, "Co-conspirator Distributor Defendants"). All of these of entities are referred to collectively herein as "Defendants."

2.      For many years, the Manufacturer Defendants unfairly impeded competitors and artificially inflated the prices that United States farmers pay for certain crop protection products.

The Manufacturer Defendants developed what they called "loyalty" or "rebate" programs with cooperating Co-conspirator Distributors and participating retailers. These programs are exclusive dealing arrangements that contravene Section 3 of the Clayton Act (15 U.S.C. § 14). While Plaintiffs will use the nomenclature "loyalty programs" throughout this Complaint, their true unlawful nature should be kept in mind. These programs substantially hindered access by farmers to lower-cost generic alternatives. The Manufacturer Defendants' respective loyalty programs have resulted in the stifling of generic competition and have preserved their monopoly power in connection with certain crop protection products, despite expired patent. Such unlawful conduct has resulted in and continues to cause substantial monetary damages to farmers across the country.

3.      Plaintiffs Danny Day, Jr. Farms and Danny Day, Jr. & Son Farm Partnership seek to recover damages in the form of overcharges incurred by themselves and the Classes defined herein due to the Manufacturer Defendants', Co-conspirator Distributors', and Retailers' violations of the antitrust laws in the markets for certain crop protection products. The Manufacturer Defendants engaged in conspiracies to illegally extend and maintain their respective monopolies in certain crop protection products with the Co-conspirator Distributors and Retailers by entering into loyalty programs to delay generic competition, in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) and Section 3 of the Clayton Act (15 U.S.C. § 14). For these claims, Plaintiffs and members of the Classes described herein seek treble damages and injunctive relief under 15 U.S.C. §§ 15 and 26, and other just relief.

4.      As a result of Defendants' anticompetitive conduct, Plaintiffs and Members of the Classes paid more for certain crop protection products than they otherwise would have paid in the absence of Defendants' unlawful conduct.

5.     Plaintiffs make the allegations herein concerning themselves based on personal knowledge and upon investigation and information and belief as to all other matters.

## I.     NATURE OF THE CASE

6.     Every year, farmers in the United States purchase over ten billion dollars of crop protection products (which include agricultural "pesticides"), crucial farm inputs that improve crop yields and food security for everyone in the United States and its territories (hereinafter referred to as the "United States"). And every year, United States farmers pay more than they should for these products because of the Manufacturer Defendants' exclusive dealing arrangements.

7.     The Manufacturer Defendants have designed these loyalty programs specifically for the purpose of excluding and marginalizing competitive generic products, which enables the Manufacturer Defendants to maintain excessive, supra-competitive prices.

8.     The Manufacturer Defendants conspired with the Co-conspirator Distributors and Retailers to execute these programs.  This conspiracy caused and continues to cause farmers to overpay for these crucial inputs.

9.     As described in more detail below, Congress has enacted a comprehensive regulatory regime for the crop protection industry that promotes the twin goals of product innovation and price competition.

10.     "Basic" manufacturers like the Manufacturer Defendants initially develop, patent, and register the active ingredients ("AI") of crop protection products. They can then extend the commercial potential of their innovations through lawfully obtained exclusive rights for a period of years. After those patent and regulatory exclusivity periods expire, generic manufacturers can enter the market with equivalent products containing the same AI, relying upon the same

toxicology and environmental impact data first developed by those basic manufacturers. Once generic penetration is initiated, such competition from generic products predictably leads to dramatic price reductions, which benefits not only generic manufacturers, but also United States farmers and consumers.

11.     Defendants systematically undermined and frustrated the goals of this system. When patent exclusivity periods for their crop protection products expired and generic manufacturers threatened to launch lower-priced competing products, the Manufacturer Defendants used their loyalty programs to unlawfully boycott and or exclude generic manufacturers from the traditional distribution channel—a critical link between manufacturers and farmers.

12.     Under their respective programs, the Manufacturer Defendants offered each Co-conspirator Distributor—collectively  comprising over 80% of all sales at the wholesale level—substantial payments conditioned on each Co-conspirator Distributor's or Retailer's sales of branded crop protection products and their agreement to limit sales by Co-conspirator Distributors of comparable generic products to a set low percentage share.  These written loyalty program agreements explicitly identify these sales thresholds as provided below.

13.     The Manufacturer Defendants labeled these payments "rebates" or "incentives" for "loyalty."  Indeed, these payments were rewards for excluding or limiting competition by the Manufacturer Defendants' generic competitors.

14.     This exclusion or limitation of generic competition predictably resulted in, among other things, higher prices for the Plaintiffs and United States farmers than would have otherwise prevailed. Co-conspirator Distributors and Retailers participated in the loyalty programs, both because the Manufacturer Defendants offered rewards for participation, and because these Co-

conspirator Distributors and Retailers profited more highly than they otherwise would have by selling lower-priced generic products.

15.     The Co-conspirator Distributors and Retailers dominate the sale of crop protection products in the United States. Thus, the scheme among the respective Manufacturer Defendants, the Co-conspirator Distributors, and the Retailers has substantially foreclosed generic competitors from efficient distribution of their products.

16.     The Manufacturer Defendants expressly designed their programs to maintain their respective ability to price their respective products at issue above competitive levels while still unlawfully retaining large market shares. The Manufacturer Defendants thus enjoyed outsized profits at the expense of farmers during the "post-patent" period—when prices for farmers would otherwise fall substantially.

17.     The Manufacturer Defendants' loyalty programs enabled each of them to maintain high prices and dominant market positions years after exclusivity for an off-patent AI. The Manufacturer Defendants' schemes forced some generic manufacturers to exit markets encumbered by loyalty programs or to decide not to enter those markets directly as a result of those programs. Even when Co-conspirator Distributors or Retailers offered competing generics, their agreements with the Manufacturer Defendants restricted the sale of these generics to minimal volumes, forcing the generic manufacturers to market their products through less efficient channels of distribution.

18.     Absent the Manufacturer Defendants', the Co-conspirator Distributors', and the Retailers' unlawful conduct, the Manufacturer Defendants would have faced increased generic competition, which would lead to increased choice and lower prices for U.S. farmers. Unless these practices are enjoined, U.S. farmers will be denied this access.

## II.      JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337(a), and 15 U.S.C. § 26.

20.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c) because during the Class Period, Defendants transacted business throughout the United States, including in this Judicial District.

21.     During the Class Period, the Manufacturer Defendants sold and shipped certain crop protection products in a continuous and uninterrupted flow of interstate commerce, which included sales of certain crop protection products in the United States, including in this Judicial District.  The Manufacturer Defendants' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States, including in this Judicial District.

22.     Likewise, the Co-Conspirator Distributors and the Retailers are geographically dispersed across the United States. They sold and shipped certain crop protection products in a continuous and uninterrupted flow of interstate commerce, which included sales of certain crop protection products in the United States, including in this Judicial District.  The Co-Conspirator Distributors' and the Retailers' conduct had direct, substantial, and reasonably foreseeable effects on interstate commerce in the United States.

23.     In addition, Corteva, Inc. maintains its corporate headquarters in the state of Indiana.

## III.      THE PARTIES

24.     Plaintiff Danny Day, Jr. Farms owns and operates farmland in Arkansas.  Plaintiff Danny Day, Jr. Farms directly purchased products at issue in this action from one or more of the

alleged Co-conspirator Distributors, including Nutrien and Helena.

25.     Plaintiff Danny Day, Jr. & Son Farm Partnership is a partnership.  Plaintiff Danny Day, Jr. & Son Farm Partnership owns and operates farmland in Arkansas.  Plaintiff Danny Day, Jr. & Son Farm Partnership directly purchased products at issue in this action from one or more of the alleged Co-conspirator Distributors, including Nutrien and Helena.

26.     Together, Danny Day, Jr. Farms and Danny Day, Jr. & Son Farm Partnership are henceforth collectively referred to as "Danny Day" or "Plaintiffs."

27.     Defendant Syngenta Crop Protection AG is a company headquartered in Basel, Switzerland with its North American headquarters in Greensboro, North Carolina.  Defendant Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG headquartered in Wilmington, Delaware. Syngenta Corporation is a corporation organized and operating under the laws of the State of Delaware.

28.     Defendant Syngenta Crop Protection, LLC is a limited liability company organized and existing under the laws of the State of Delaware. It is headquartered in Greensboro, North Carolina and is also a corporate affiliate of Syngenta Crop Protection AG.

29.     Defendant Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC all transact or have transacted business in this Judicial District. Furthermore, each engages in the development, manufacture, and sale of certain crop protection products.

30.     Defendant Corteva is a publicly held corporation with its headquarters in Indianapolis, Indiana. Corteva is the successor company to the agriscience businesses of E.I. du Pont de Nemours ("DuPont") and Dow Chemical Company ("Dow"), which merged in 2017. Corteva is a corporation organized and existing under the laws of the State of Delaware.

31.     Corteva is located and transacts or has transacted business in this Judicial District and is engaged in the development, manufacture, and sale of certain crop protection products.

32.     Defendant BASF SE is a multinational global chemical company headquartered in Ludwigshafen, Germany. It is the largest chemical producer in the world. It transacts business in this Judicial District through its subsidiaries and divisions.

33.     Defendant BASF Corporation, headquartered at 100 Park Avenue, Florham Park, New Jersey 07932, is the North American affiliate of BASF SE.

34.     Defendant BASF Agricultural Products Group is a division of BASF SE and is headquartered at 14385 West Port Arthur Road, Beaumont, Texas. It transacts or has transacted business in this Judicial District.

35.     Defendant Nutrien is a national wholesale distributor and retailer of crop protection products, including some or all the products at-issue in this action, with its corporate offices located in Loveland, Colorado.  Nutrien transacts or has transacted business in this Judicial District.  Nutrien is a corporation organized and existing under the laws of the State of Delaware.

36.     Defendant Helena describes itself as one of the nation's foremost agricultural distributors.  It is headquartered in Collierville, Tennessee, and among other things, it distributes crop protection products, including some or all of the products at-issue in this action.  Helena transacts or has transacted business in this Judicial District.  Helena is a corporation organized and existing under the laws of the State of Delaware.

37.     Additional entities participated in the acts described herein, but their identities are unknown to plaintiffs at this time. Plaintiffs reserve the right to amend this complaint once their identities become known.

## IV.    INDUSTRY BACKGROUND

### A.    Crop Protection Products.

38.    Most pesticides sold in the United States are used for crop protection.  They can kill or control pests, *i.e.*, diseases, weed, insects, and other organisms. As used herein, and consistently with industry practice, the term "pesticides" refers collectively to insecticides (including nemanticides), herbicides, and fungicides.

39.    Pesticides are frequently used by farmers to prevent the harm that pests cause to their crops.  The pesticides used for crop protection are referred to herein as "certain crop protection products."  Certain crop protection products are essential for farming as their use substantially boost quality and crop yields for reliable food supply.

40.    Crop protection products fall into the following three primary categories: (1) herbicides to target plants or weeds; (2) insecticides (including nematicides) to target insect infestations; and (3) fungicides to target fungal diseases. Though each type of crop protection product has a separate target, all are still referred to generally as pesticides in common vernacular and within this complaint.

41.    Every crop protection product includes one or more AI.  AIs are chemical substances that kill or reduce the targeted pest. A crop protection product contains at least one AI, which is the chemical substance that kills or controls the targeted pest. A finished crop protection product is comprised of an AI and an inert component (water, adjuvants, surfactants, or other active ingredients).  Final products with one active ingredient are considered "straight goods" and products with at least two active ingredients are considered "mixtures."

42.    AIs may be sold individually in "technical grade" or for "manufacturing use,"

before being formulated into a completed crop protection product. Additional processing, however, is necessary before they can be used by farmers as final crop protection products.

43.     Several criteria serve to distinguish one AI from another. These include: (a) the pest(s) targeted by an AI; (b) the effectiveness of an AI at controlling the targeted pest, which is often measured in terms of crop yield improvements; (c) the crops upon which an active ingredient is suited and registered to be used, which may correlate with geography; (d) the stage of the growing cycle at which an active ingredient may be used; and (e) the performance of an active ingredient under prevailing climate and weather conditions.

44.     Each AI has what is referred to as a "mode of action," which is the chemical and biological sequence of events that causes a pesticide to kill or control the targeted pest. While AIs that share a common mode of action tend to have similar use cases, there are often differences in performance and other reasons why one active ingredient cannot readily replace another for a given application or a given condition. Farmers may prefer one AI over another for various reasons, including the specific performance characteristics of the active ingredient or a farmer's past success with an active ingredient. As a result, a chemically equivalent generic crop-protection product is a closer substitute for a given branded product than is a product containing a different AI.

45.     The market value for all Crop Protection Products was estimated to be $12.1 billion in 2019.  Herbicides accounted for about two-thirds of that amount, with sales estimated at $8.32 billion.  Insecticides had estimated sales of $1.7 billion, and fungicides at $1.95 billion.[1]

---

[1] The US Agrochemical Market: Channel Facing Pressure of Profitability and Consolidation, New Commercial Approach Emerges, www.agropages.com (Oct. 16, 2020) (last accessed on Oct. 21, 2022).

**B.    Crop Protection Product Manufacturers.**

46.    The Manufacturer Defendants formulate, market, and sell crop protection products. Crop protection product manufacturers either synthesize the active ingredients for their formulated products in their own facilities or obtain the AI from other chemical manufacturers.

47.    The Manufacturer Defendants are called "basic" manufacturers. A basic manufacturer in the crop protection product market will research, develop, and patent new AIs. The Manufacture Defendants are among the largest crop protection product manufacturers in the United States, as well as globally.

48.    Generic manufacturers of crop protection products alternatively sell products that contain AI created by others following the expiration of any patents or regulatory exclusivity periods (also known as "post-patent" AI). Well over a dozen generic manufacturers sell crop protection products in the United States.

**C.    The Regulatory Process for Crop Protection Products.**

49.    Congress enacted a patent and regulatory framework to govern crop protection products.[2] The regulations grant developers of new AI exclusivity from competition for that active ingredient for a period of twenty years.

50.    The regulations also facilitate generic entry upon the expiration of the exclusivity periods. To ensure the safety of new, innovative crop protection products, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") requires submission, review, and approval by the United States Environmental Protection Agency ("EPA") prior to the sale or distribution of any pesticide to ensure product safety in the United States.

51.    After the EPA approves a new active ingredient, the original registrant (usually a

---

[2] *See* http://npic.orst.edu/reg/laws.html (last accessed on October 20, 2022).

basic manufacturer) gains the exclusive right to cite the data it submitted in support of the active ingredient for a baseline period of ten years. Frequently, this regulatory exclusive-use period extends the basic manufacturer's patent term and its right to the exclusive provision of products containing that AI. Following the patent and exclusivity, a generic manufacturer can enter the market with crop protection products containing the AI. In doing so, it has to pay the basic manufacturer of the branded product for access to its data concerning the product. The cost of such access is called data compensation costs and can be as high as multiple millions of dollars.

### D.  The Traditional Distribution Channel.

52.     Within the crop protection products market, a manufacturer sells to a distributor who then sells to numerous retail outlets, including its own retailers, that have a strong farmer customer base. This method is known as the traditional distribution channel, or just the "channel." It is illustrated in the chart below.[3]



---

[3] From Shane Thomas, The Implications of Suing Corteva and Syngenta (Oct. 7, 2022), available at https://upstreamaginsights.substack.com/p/the-implications-of-ftc-suing-corteva?utm_source=profile&utm_medium=reader2 (last accessed on Oct. 20, 2022),

53.     Over ninety percent of crop protection product sales in the United States occur through the traditional distribution channel. More than ninety percent of the traditional distribution channel is composed of just seven distributors. Those seven distributors account for roughly eighty percent of crop protection product sales in the United States.

54.     The most efficient way for a crop protection product manufacturer to sell its product is through this traditional channel because: (a) distributors provide access to a network of retail and farmer customers and the logistics networks to service a broad range of customers; (b) manufacturers can reach thousands of retailers and farmers through selling to only a limited number of distributors; and (c) distributors offer helpful services and functions including warehousing, transportation, credit, and marketing.

### E.     Life Cycle Management of Crop Protection Products.

55.     When the market is operating without interference, generic crop protection products are typically priced substantially lower than their branded counterparts. When a generic manufacturer obtains market access through a traditional channel, its entry into the market initiates price competition. Both price and sales volume for the branded products then adjust downward.

56.     To protect against downward pricing and loss of product profits associated with generic entry, as alleged herein the Manufacturer Defendants have employed strategies designed to inhibit generic entry after the end of patent and regulatory exclusivity, and to minimize the competitive impact of such entry on branded products containing the same AI. Efforts by the Manufacturer Defendants to incentivize Co-conspirator Distributors and Retailers to circumvent that entry through so-called "loyalty programs" are an instrumental part of those strategies.

## V.   MANUFACTURER DEFENDANTS' UNLAWFUL CONDUCT

57.   The Manufacturer Defendants all used "loyalty programs," that is, exclusive dealing agreements, to stifle the distribution of competitive generic crop protection products. This conduct directly impeded Plaintiffs' and other farmers' access to less expensive generic crop protection products. Manufacturer Defendants and Co-conspirator Distributors or Retailers utilized these loyalty programs with the purpose, intent, and understanding that the programs would hinder generic competition and keep their AI prices higher than they would have been in a market free from interference. Using these loyalty programs, the Manufacturer Defendants retained market prices and market share of their branded products at levels higher than would otherwise be attainable following patent and regulatory expiry.

58.   Under their respective loyalty programs, the Manufacturer Defendants offer substantial exclusion payments to Co-conspirator Distributors and some Retailers conditioned on their limiting their sales of generic crop protection products containing specified post-patent AI.

59.   The Manufacturer Defendants are among the top 20 global agrochemical companies.  For example, in Fiscal Year 2021, Syngenta was reported to be number one (with $13.3 billion in sales), BASF was reported to be number three (with $7.7 billion in sales), and Corteva was reported to be number four (with $7.2 billion in sales).[4]

60.   The Manufacturer Defendants' loyalty programs sidelined generic manufacturers, allowing the Manufacturer Defendants to maintain market share despite pricing their crop protection products above competitive levels. The programs allowed Co-conspirator Distributors and Retailers to reap profits from prolonged elevated pricing of the Manufacturer Defendants'

---

[4] Upstream AG Insights For October 16, 2022, available at https://upstreamaginsights.substack.com/p/upstream-ag-insights-october-16th?utm_source=profile&utm_medium=reader2 (last accessed October 20, 2022).

branded pesticides. As to AIs that are the primary focus of this Complaint, each Manufacturer Defendant has substantially achieved and maintained its monopolistic goals through its loyalty program with Co-conspirator Distributors and Retailers. The Manufacturer Defendants have kept generic manufacturers from supplying meaningful competition which allowed the Manufacturer Defendants and their co-conspirators to raise, fix, maintain, or stabilize prices for certain crop protection products above competitive levels.

### A.    The Loyalty Programs.

61.    Syngenta's loyalty program is called the "Key AI" program. Syngenta operates this program by agreement with its Co-conspirator Distributors and Retailers. BASF operates a similar program through what it now calls its "Share of Wallet" ("SOW") program with its Co-conspirator Distributors and Retailers. Corteva likewise operates a similar program through what it now calls its "Retailer Advantage" program with its Co-conspirator Distributors and Retailers.

62.    Regardless of the program name,  each Manufacturer Defendant's program generates supra-competitive profits, which each Manufacturer Defendant partially shares with the Co-conspirator Distributors and Retailers.  Consequently, farmers are left with higher-priced brand products and limited or no choice of available generic substitutes. By employing the exclusionary agreements, the Manufacturer Defendants have  restricted access of farmers to the traditional distribution channel for those generic products.

### B.    Operation of and Adherence to Loyalty Programs.

63.    The Manufacturer Defendants retained unlawful loyalty-program agreements with specific Co-conspirator Distributors. Those distributors account for 80% or more of all sales of crop protection products in the United States.

64.    The top seven sellers of crop protection products in the United States are,

according to Crop Life, www.croplife.com: (1) Nutrien; (2) Helena; (3) SGS; (4) Growmark, Inc., based in Bloomington, IL; (5) Wilbur-Ellis Co., based in Aurora, CO; (6) CHS, based in Inver Grove, MN; and (7) Greenpoint, AG, based in Decatur, AL.  On information and belief, and subject to confirmatory discovery, these entities all participated in the Manufacturer Defendants' loyalty programs and are therefore alleged to be Co-conspirator Distributors. Plaintiffs purchased at-issue products from one or more of these entities or their associated Retailers.

65.     The Manufacturer Defendants' agreements with Co-conspirator Distributors and Retailers provide exclusion payments in exchange for selling (and by prerequisite stocking) certain volumes of specific AIs. Whether labeled as "loyalty thresholds", "loyalty requirements" or described in terms of "qualifying EDI products volumes" (where the acronym "EDI" refers to "Environmental Data Initiative") these programs incentivize Co-conspirator Distributors and Retailers to drastically limit both their supply and sales of generic products for specific AIs.

66.     Because the loyalty program incentive payments are so important to the Co-conspirator Distributors' and the Retailers' profits, the loyalty programs ensure that they can only sell minimal amounts of generic products to ensure they reach the obligatory thresholds. In some instances, these distributors are forbidden by the loyalty program agreements from purchasing any products from generic manufacturers. Some have deferred generic product purchases until the end of the season to make sure they meet the required threshold under the loyalty programs, leaving farmers without a reasonable choice of product during the time farmers most need it.  The Manufacturer Defendants, the Co-conspiring Distributors and Retailers have firmly upheld the terms of their loyalty programs.  If a Co-conspirator Distributor or Retailer fails to so restrict its sales of generic product, pursuant to the loyalty program agreement, it will

be monetarily penalized.

67.     The volume of sales by co-conspiring distributors assures participating distributors that no significant competing distributor will partner closely with lower-priced generic manufacturers.

**C.      Loyalty Agreements:  Their Operation and Effect.**

68.     Over several years, Plaintiffs have purchased multiple products, which are subject of the programs described below, from Co-Conspirator Distributors and or Retailers. Although the Manufacturer Defendants have used varying terminology and varying threshold requirements and EDI volumes as their programs developed, the unlawful intent and nature of these agreements has remained consistent.

**1.      Syngenta's "Loyalty Program."**

69.     As early as 2004, Syngenta acted with Co-conspirator Distributors and Retailers to incentivize their stocking and sale of certain of its selected brand products to U.S. farmers. (Excerpts from the 2004 Syngenta LP are attached as Exhibit 1). The 2004 agreement covered AI products that are at issue here, as seen below:[5]

### 2004 SOUTHERN FIELD CROPS
#### R E T A I L E R   P R O G R A M

**Portfolio Sales Support**
*Rewards Retailers for their stewardship of Syngenta brands.*

| BRANDS | ACTIVITY | INCENTIVE |
|---|---|---|
| All participating Syngenta Crop Protection brands and pack sizes. Corn and cotton seed commercially treated with the Syngenta Seed Treatment product - Cruiser®. | • Purchase and sell Syngenta brands to growers | 4% |

**Bulk Support**
*Rewards Retailers for stewardship and investment in facilities for all Syngenta bulk brands.*

| BULK PRODUCTS | INCENTIVE | KEY DATES | ACTIVITY |
|---|---|---|---|
| Bicep II MAGNUM® brands, Dual MAGNUM® brands, and LUMAX™ | 10% | Dec. 31st, 2003 | Stewardship of Syngenta bulk brands: • Bulk site inspection & compliance |
| AAtrex®, Boundary®, Expert®, Princep®, Sequence™ and Touchdown® brands except CF | 7% | | • Retailer agrees to accept a minimum shipment by the Key Dates |
| Bravo®, Caparol® and Gramoxone Max™ | | Mar. 14th, 2004 | • Evergreen commitment for each tank and brand at each location. |
| Touchdown® CF | 5% | | |

70.     To further maintain its monopoly, in this 2004 Loyalty Program agreement, Syngenta unlawfully targeted generics, incentivizing Retailers to block generic infiltration into the critical traditional distribution channel for many of its AIs.[6] As seen below, Syngenta explicitly targeted generic exclusion by "[r]eward[ing] Retailers for their loyalty to Syngenta brands where a generic alternative exists."

**Key Active Ingredient Support**
*Rewards Retailers for their loyalty to Syngenta brands where a generic alternative exists.*

| ACTIVE INGREDIENTS | BRANDS | SYNGENTA THRESHOLD SHARE | INCENTIVE |
|---|---|---|---|
| Abamectin | Agri-mek®, Zephyr®, and Clinch® | | |
| S-metolachlor | Boundary®, Bicep II MAGNUM® brands, Dual MAGNUM® brands, Expert™, LUMAX™ and Sequence™ | 98% | 5% |
| Paraquat | Gramoxone Max™ | | |
| Lambda Cyhalothrin | Warrior® and Karate® | | |
| Flumetralin | Prime+® | 95% | |
| Chlorothalonil | Bravo® brands and Tilt®/Bravo® | | |
| Propiconazole | Orbit™ and Tilt® | 90% | |
| Mefenoxam | Ridomil Gold® brands | | |
| Prometryn | Caparol® | 85% | |

71.     This 2004 Loyalty Program protected multiple AIs, including s-metolachlor, paraquat, and lambda cyhalothrin—each of which were purchased by the Plaintiffs—by requiring retailers to meet a 98% threshold share in order to collect a 5% incentive payment.  The threshold requirement meant that the participating retailer could not carry or sell greater than 2% of generic competitor products containing these AIs, essentially blocking any meaningful competing generic products from entering this point in the distribution chain.

---

[6] *Id.*

72. Through additional incentive programs, Retailers could also achieve massive profits by meeting each "support" programs' mandatory stocking, selling, or blocking incentive requirements. The profits from the maximum incentive programs shown below would have translated into the millions[7]:

**Summary of Maximum Potential Incentives under 2004 Syngenta Southern Field Crops Retailer Offer.**

| BULK BRANDS | MAXIMUM INCENTIVE POSSIBLE |
|---|---|
| Bicep II MAGNUM® brands, Dual MAGNUM® brands and LUMAX™ | 19% |
| AAtrex®, Bravo® brands, Boundary®, Caparol®, Expert™, Gramoxone Max™, Sequence™ and Touchdown® brands | 16% |
| Princep® | 11% |
| Touchdown CF™ | 9% |
| **PACKAGE BRANDS** | **MAXIMUM INCENTIVE POSSIBLE** |
| Karate®, Tilt® and Warrior® | 14% |
| AAtrex®, Abound®, Agri-mek®, Amistar™, Bicep II MAGNUM® brands, Boundary®, Bravo® brands, Carnix™, Caparol®, Callisto™, Centric®, Clinch®, Curacron®, Cruiser® on commercially treated cotton seed, Denim™, Dual MAGNUM® brands, Envoke™, Expert™, Flexstar®, Force® 3G, Fusilade®, Fusion®, Gramoxone Max™, LUMAX, Omega®, Orbit®, Platinum®, Platinum®/Ridomil Gold®, Prime+®, Proclaim®, Quadris®, Quadris®/Bravo®, Quilt™, Reflex®, Ridomil Gold® brands, Ridomil®/Bravo®, Sequence™, Suprend™, Tilt/Bravo®, Touchdown® brands except CF, Uniform™ (Quadris®/Ridomil Gold®), Zephyr® | 9% |
| All other participating package brands | 4% |

73. Importantly, although billed as a "Retailer" program, the program is reflective of the industry's blurred distinction between retailers and distributors. Syngenta defined "Retailers" as "a retail business which purchases Syngenta products from Syngenta or an authorized Syngenta Distributor who has been appointed by Syngenta to sell and service eligible Syngenta products within the retailer's geographic area and resells such products to growers." *Id*.

74. The program then uses the term "distributors," as shown below, when delineating

---

[7] *Id.*

the qualifications for participation in the same program[8]:



- Qualification and performance for this program are determined based on net EDI sales transactions as reported by an authorized Syngenta distributor and then sold to growers. Net EDI sales are defined as purchases in weight or volume minus any returns from a contracted Syngenta Distributor. Purchases from ineligible entities or unauthorized distributors will be disqualified and not included in qualification or payment. Any volumes determined by Syngenta to be 'brokered' will be disqualified.
- Sales from Retailer-to-Retailer do not qualify for qualification levels or program incentives.
- Distributors and Distributor-owned Retailers cannot claim sales to or from independent Retailers for qualification and or incentive payment under this program. Any sales made by a Distributor must be reported to Syngenta with accurate Retailer or 'end user' designation. Reporting sales to Retailers as 'end users' is fraud and will result in data being declared ineligible for consideration in this program. Reporting of excessive quantities that equate to more products than an 'end user' can use on his acreage will result in data being declared ineligible for consideration in this program. Sales to 'brokers' (including Internet brokers), and others that are not considered Retailers by definition in this program will be disqualified. Syngenta reserves the right to be the final authority in determining the validity of data and the inclusion of said data in this program.

75. A similar 2016 Syngenta loyalty program agreement shows the continued scheme to protect its monopoly of "key AIs" by rewarding retailers for supporting certain Syngenta AIs when a generic alternative exists. (Excerpts from the 2016 Syngenta LP are attached as Exhibit 2). The image below shows continuation of incentives on older AIs and inclusion of new AIs.

**Section 2. Key Active Ingredient Support**
Reward Retailers for their support of Syngenta products where a generic alternative exists.

| ACTIVE INGREDIENTS | PRODUCTS | RETAILER SUPPORT THRESHOLD | INCENTIVE |
|---|---|---|---|
| Mesotrione | Acuron, Callisto 4SC, Callisto GT, Callisto Xtra, Halex GT, Lexar EZ, Lumax EZ, Zemax | 99% | 5% |
| Clodinafop | Discover NG | 98% | |
| Azoxystrobin | Abound, Quadris, Quadris Opti, Quadris Top, Quadris Top SB, Quadris Top SBX, Quilt, Quilt Xcel, Uniform | 94% | 10% |
| Diquat | Reglone | 90% | 5% |
| Flumetralin | Prime+ | | |
| Fomesafen | Flexstar, Flexstar GT, Flexstar GT 3.5, Prefix, Reflex | | |
| Mefenoxam | Quadris Ridomil Gold, Ridomil Gold brands, Ridomil Gold Bravo | | |
| S-metolachlor (S-MOC) | Bicep II Magnum brands, Bicep Lite II Magnum, BroadAxe XC, Boundary, Dual Magnum, Dual II Magnum brands, Expert, Sequence | | |
| Abamectin | Agri-Flex, Agri-Mek SC | 85% | |
| Lambda Cyhalothrin | Karate with Zeon Technology, Warrior II with Zeon Technology | | |
| Paraquat | Gramoxone SL, Gramoxone SL 2.0 | | |

[8] Id.

20

76. The products above are listed by AI, including mesotrione, azoxystrobin, s-metolachor, lambda cyhalothrin, fomesafen, and paraquat, all of which have been purchased by Plaintiffs. Retailers are required to support each Syngenta AI at a certain threshold through sales of Syngenta's AI in order to receive an incentive (*i.e.*, a rebate).

77. Thus, for example, to obtain the 5% incentive applicable to mesotrione, the retailer must achieve a threshold of 99% Syngenta mesotrione sales. For azoxystrobin, the threshold is 98% and the incentive is even higher—10%. And for s-metalachor, it is 90%. Older AIs, such as paraquat and lambda cyhalothrin, that once required a 98% threshold in 2004, still required an 85% threshold in 2016. Thus, the threshold and incentive amounts changed, but the objective did not.

78. The purpose and effect of the 2016 loyalty program remained the same: in order to obtain the incentive, a retailer must virtually exclude generic products containing the AI from its inventory. Such incentive payments are substantial amounts of income for the participating Co-conspirator Distributors and Retailers.

79. As reflected in these documents, Syngenta polices these requirements rigorously. It starts by collecting data from the Retailers, which must provide information about their total net sales to farmers of Syngenta and generic products before Syngenta will make incentive payments to the Retailers. Syngenta provides Retailers with a handy digital calculator app to assist them in making sure they have correctly calculated the necessary support threshold. Syngenta reserves the right to verify the accuracy of the Retailers' math and to independently audit the threshold figures to confirm to Syngenta's satisfaction that the retailers have earned Syngenta's incentive award by selling the required percentages of Syngenta AI. Syngenta has had these programs over many years.

80.     As also reflected in these documents, Syngenta can at will modify the incentive system based on its determination of changes in the market and has full discretion to change the AI calculator at any time to reflect what Syngenta believes are the current marketplace conditions.  Syngenta's loyalty program thus deprives generic competitors of the ability to gain meaningful market share, as is intended.  Such suppression of generic market penetration causes the Plaintiffs and US farmers to pay artificially maintained higher prices for these products.

**2.     BASF's EDI program and SOW program.**

81.     BASF's history of acting with Co-conspirator Distributors and Retailers has included utilizing EDI volumes goals to disincentivize co-conspirator's stocking and selling of competitor generic products and later incorporating its "Share of Wallet" program to accomplish the same objective.

82.     Like Syngenta, and in accordance with industry practice, BASF's 2004 loyalty program agreement encompassed actions by participating Retailers and Co-conspirator Distributors. (Excerpts from the 2004 BASF LP are attached as Exhibit 3.) As seen below, though BASF's program is labeled as a "Retailer Package Program", it also explicitly includes distributors under "Eligibility":[9]

---

[9] 2004 BASF Retailer Package Program.

**2004** **BASF Retailer Package Program**

Effective: October 1, 2003

**Objective:**
To strengthen long-term, strategic, business relationships between BASF and Retailer accounts by rewarding local demand creation efforts and stewardship of BASF package brands. BASF endeavors to assist Retailers in growing their business with grower customers through product technology, convenient packaging and product support.

**Program Period:**
October 1, 2003 through September 30, 2004

**Effective Area:**
All states in the U.S. marketing area

**Eligibility:**
❑   All Retailers meeting the minimum BASF net sales dollars required for its defined geography reported through EDI by October 8, 2004.

❑   Only purchases from BASF Authorized Distributors will be eligible.

83.     Under its 2004 program, BASF sought to exclude generic competition by incentivizing Retailers to maintain at least 90% of specific brand BASF sales from year to year. Incentives were based on "Net EDI sales defined as Authorized Distributor transmissions of product movement transactions" from October 1, 2003, through September 30, 2004.[10]

84.     If a participant failed to obtain a 90% repeat of sales from years 2003 to 2004, BASF's offered rebate was halved, causing a loss of profits within the millions for any participating Retailer or Co-conspirator Distributor. The program's associated schedules are detailed below:

---

[10] *Id.*

Payment Incentive:
Base Payment Incentive:

| Participating Incentivized BASF Package Brands | Schedule A — If 2004 Total Qualified BASF Net EDI Sales (Bulk + Package) is *90% or Greater* Than Retailer's 2003 Total Qualified BASF Net EDI Sales | Schedule B — If 2004 Total Qualified BASF Net EDI Sales (Bulk + Package) is *Less Than 90%* of Retailer's 2003 Total Qualified BASF Net EDI Sales |
|---|---|---|
| Apogee®, Beyond™, Cabrio® EG, Cadre® DG, Clarity®, Conclude Xact®,Counter® CR and 15G, Distinct®, Facet®, Frontier®, G-Max Lite™, Guardsman®, Guardsman Max™, Newpath®, Nexter®, Pentia®, Pix® Plus, Pix® Ultra, Ponnax®, Outlook®, Prowl®EC, Prowl® H$_2$O, Pursuit®, Pursuit® Plus, Raptor®, Regent®, Rezult®, Scepter®, Squadron®, Sovran®. | 12% | 6% |
| Acrobat® 50WP, Backdraft® SL, Celebrity Plus®, Extreme™, Marksman®, Paramount®, Pyramite™, Ronilan®, Steel®, Weedmaster®. | 8% | 4% |

\* Brands repacked by distributors or shuttles filled by BASF will be paid at the same percentage as the package payment for that brand
\*\* Excluding the states of WA, OR, ID, MT, CA, UT, NV

2004 BASF Retailer Package Program Rules and Conditions:

☐ Payment Incentives will be calculated at a Retailer's Operating Unit level.

☐ All Payment Incentives will be based on Net EDI Sales defined as Authorized Distributor transmissions of product movement transactions via EDI (purchases less returns) from October 1, 2003 to September 30, 2004.

85.     The program's requirement that Retailers and distributors essentially repeat their percentage of participating brand product sales from 2003-04, worked to ensure that there would be little remaining room in the market for the AIs at issue for any additional sales by generic competitor.

86.     The pesticide market is, by its very nature, a limited one. In each geographical region, there is a finite number of acres that require crop-protection products. Distributors and Retailers providing crop-protection products in their respective geographical areas are not likely to experience substantial increases in demand due to an increase in overall acres needing protection. The total amount of pesticides purchased and sold in any given year are likely to remain stable from year to year.

87.     By incentivizing Retailers and Co-conspirator Distributors to repeat their

purchases and sales of BASF's selected AI products from year to year, within a 90% threshold, ensures that newly competitive generic AI products for protecting those same acres are not available through the traditional distribution chain to the farmers that need them.

88.     Included in BASF's 2004 loyalty program are multiple AI products, including the AI pendimethalin and its associated product Prowl, a product which Plaintiff purchased during the relevant time-period. By meeting the terms of BASF's loyalty program, participating Retailers and Co-conspirator Distributors received a 12% base pay incentive for maintaining 90% of its Prowl sales from 2003-2004.[11]

89.     In 2021, BASF continued its efforts to thwart generic intrusion of its key AI market into the traditional distribution channel through its adapted loyalty program, which it now called "SOW".[12] The BASF 2021 Retailer Base Program is attached in its entirety as Exhibit 4. The BASF 2022 National Program Summary, with similar incentive programs and thresholds, is attached in its entirety as Exhibit 8.

90.     The term SOW indicates the percentage of sales of BASF branded products that a Retailer must achieve in order to earn the "Base Incentive" for the "AI Loyalty Brands." As with Syngenta, the program is policed through having the Retailer submit SOW percentages to BASF in order to be entitled to any incentive payments.

91.     This BASF 2020-21 loyalty program agreement required participants to maintain 90% and 95% thresholds on multiple brand products to receive its valuable SOW incentive. On page three of that agreement, BASF listed those AI products, all believed to be off-patent, which were subject to 90% or higher threshold requirement:

---

[11] 2004 BASF Retailer Package Program.

[12] See EX 4, 2021 Retailer Base Program.

4. **AI Loyalty Requirement**:

| AI | BRANDS | SOW REQUIREMENT | ACTIVITY |
|---|---|---|---|
| BOSCALID | **Endura EG** fungicide, **Pristine EG** fungicide | 90% | BASF Authorized Retailer is required to submit SOW% through enrollment tool by **October 15, 2021** |
| F500 | **Cabrio** fungicide, **Headline AMP** fungicide, **Headline EC** fungicide, **Headline SC** fungicide, **Merivon** fungicide, **Nexicor** fungicide, **Priaxor** fungicide, **Pristine EG** fungicide, **Revytek** fungicide, and **Veltyma** fungicide | 90% | |
| GLUFOSINATE-AMMONIUM* | **Liberty** herbicide, **Noventa™** herbicide, and BASF sourced private label Glufosinate-ammonium | 90% | |
| IMAZAMOX | **Beyond** herbicide, **Raptor** herbicide, and **Varisto** herbicide | 95% | |
| PENDIMETHALIN | **Prowl 3.3 EC** herbicide, **Prowl H2O** herbicide and BASF sourced private label Pendimethalin | 90% | |

* Glufosinate-ammonium loyalty requirement is waived for: AZ, CA, FL, ID, NV, OR, UT and WA.

   a.   In order to earn the Base Incentive on AI Loyalty Brands (listed above) an active ingredient Share of Wallet (SOW) is required at the thresholds indicated as the SOW Requirement:

- 90% SOW on Boscalid containing brands
- 90% SOW on F500 containing brands
- 90% SOW on Glufosinate-ammonium containing brands
- 95% SOW on Imazamox containing brands
- 90% SOW on Pendimethalin containing brands

92.      Four of the five categories of AIs included in the 2021 BASF Loyalty Program includes at least one product purchased by Plaintiffs during the relevant time-period: glufosinate, pendimethalin, F500, and imazamox.

      **3.**      **Corteva's, And Its Predecessor  DuPont's, EDI Volumes Programs.**

93.      Corteva, and its predecessor DuPont, used EDI volumes as the basis of its various programs to incentive participating Retailers and Co-conspiring Distributors to limit generic competition to its key AIs.

94.      Prior to the merger of Dow and DuPont, the latter had in place a "DuPont Agricultural Retailer Sales & Service Incentive Offers" program that offered to retailers with incentive payments through profiting on DuPont crop protection products. (Excerpts from the 2005-2006 Du Pont LP are attached as Exhibit 5).

95.     The program was implemented by rebates calculated with reference to "base incentives" and "additional incentives" that allowed Retailers to engage in "stewardship" for DuPont branded products, which meant selling less generic competitive products. Additionally, prior to the merger, Dow also had a similar program of Retailers' "Stocking" and "Stewardship" for its branded products.

96.     The Stocking incentive required retailers to stock and sale a certain threshold percentage of certain of its brand products. Like BASF's EDI volumes program, this Stocking program required participants to stock and sell an amount of certain AI products based on the previous year's EDI, ensuring that only a minimum percentage of generic competition to those specific products would be able to enter that participant's chain of distribution. As seen in the image below, the stocking threshold for certain AIs reached up to 75% of the previous year's EDI volume:

### Stocking

Once the minimum requirement is met by the stocking date and sold by the end of the Market Year, payment is made on all net purchases during the program year.

| Product | Stocking Pay Rate | Min. Volume Customer Must Stock & Sell in 2005-2006 | Date |
|---|---|---|---|
| Sonalan® 10G herbicide | 4.5% | 8,000 lbs. | 11/15/05 |
| Sonalan HFP Bulk | 4.0% | 1,000 gallons | 11/15/05 |
| Dow AgroSciences Branded Acetochlor Bulk | 4.0% | 1,000 gallons | 12/5/05 |
| Dow AgroSciences Branded Acetochlor Custom Repack | 4.0% | Minimum repack order | 12/5/05 |
| Lorsban® 15G insecticide | 10.0% | 75% of 2004-2005 EDI | 12/5/05 |
| Treflan® TR-10® herbicide | 4.5% | 70% of 2004-2005 EDI | 12/5/05 |
| Glyphomax® XRT herbicide & Durango® herbicide Bulk | 4.0% | 1,000 gallons | 2/15/06 |
| FirstRate® herbicide | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Glyphomax XRT & Durango Custom Repack | 4.0% | Minimum repack order | 3/15/06 |
| Glyphomax XRT & Durango package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Hornet® WDG herbicide | 3.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Pendimax® 3.3EC herbicide Bulk | 6.0% | 1,000 gallons | 3/15/06 |
| Pendimax 3.3EC Custom Repack | 6.0% | Minimum repack order | 3/15/06 |
| Pendimax Package | 6.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Python® WDG herbicide 4x2.5 lbs. | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |
| Sonalan HFP Package | 4.0% | 70% of 2004-2005 EDI | 3/15/06 |

97.     As seen below, the same 2005-2006 program also offered a Stewardship incentive program for certain products that met an 80% EDI threshold:

4. Dow AgroSciences may make program progress payments during the 2005-2006 Market Year:
   (a) Progress payments are based on 80% of the stewardship earnings of participating products calculated from EDI-reported data available to Dow AgroSciences.
   (b) Final payment issued by December 31, 2006.
   (c) Following the program end date and final payment for the 2005-2006 program, any change in an EDI product value resulting in a negative program earning will be deducted from future Dow AgroSciences Retail Program earnings.

98.     In a 2015 Dupont loyalty program agreement, participants had to exceed their prior year's sales of specific AIs and products in exchange an additional profitable bonus offer. (Excerpts from the 2015 Dupont LP are attached as Exhibit 6). The 105% threshold seen below, meant that even fewer generic competitor products would be allowed to complete than the small percentage allowed under the program's terms the previous year.[13]

Sales and Service Pays
The Sales and Service Pays incentive is a reward for achieving total portfolio growth vs the prior year.

Criteria
• Qualify for the Retail Advantage - Sales and Service Incentive
• Earn 1% on total portfolio sales with growth of 105% over prior year.
• Earn another 1% on the total portfolio if sales growth of the following products collectively total 105% over prior year.
    • Afforia™, Aproach® Prima, Coragen®, Envive®, Fontelis®, LeadOff®, Prevathon®, Realm® Q and Vydate® C-LV.

---

[13] Dupont 2015 Retail Sales Advantage Program.

99.     Programs similar to the 2005-06 DuPont program are carried on by Corteva. Corteva's loyalty program agreement is reflected in the following page taken from its 2020-21 Retail Offers brochure:



## Retail Advantage Program

The Retail Advantage Program has been designed to provide retail channel partners with competitive rewards for supporting Corteva products.

### Program Qualification

The Corteva Agriscience™ Retail Advantage Program payment is based on product volume reported by approved distributors via EDI to Corteva. Only products intended for resale to growers are eligible for payment under the terms of this program. Retail customers must have purchased a minimum of $50,000 of participating and qualifying products between Oct. 1, 2020 and Sep. 30, 2021 to be eligible for program earnings.

### Program Payment

Retailers will have an opportunity to earn a reward payment on participating products provided the following criteria are met:

- Participating in training workshops as needed
- Work with the Corteva Territory Manager to develop new market or product opportunities
- Promptly reporting product or performance concerns
- Work with the Corteva Territory Manager to resolve any product or performance issues that may arise
- Follow the product label and providing sound agronomic recommendations
- Comply with all local, state and federal regulations in the storage and distribution of Corteva products
- Submit valid Grower data for the Corteva crop protection portfolio

### Qualifying Products for EDI Product Values

Additional Corteva Agriscience™ Crop Protection and Range & Pasture EDI product values count toward meeting the $50,000 purchase requirement, but do not participate in any retail payments. For more information, see terms and conditions section in the back of this book.

**Where to submit data**

www.yourdatadimensions.com
Customer Support: 1-800-901-0012

**Data Dimensions User Guide**
www.yourdatadimensions.com/
UserGuide/UserGuide.pdf

**How to submit Grower Purchase data**

- Upload an existing Excel file containing required information and utilize the Data Dimensions mapping tool
- Key in purchase information fields that are prompted on website
- Utilize vendor support SSI/AgVance and Agrimine. Contact information found in user guide
- EDI/XML data currently fed into Data Dimensions for reporting purposes

**Key dates**

- Program dates:
  Oct. 1, 2020 – Sep. 30, 2021
- Grower point of sale data report deadline: Oct. 15, 2021

Not applicable to products sold outside the United States

100.    In order to obtain the rebates promised under this program, the Retailer must be a significant force in the market, with a minimum of $50,000 in Corteva sales during the previous year. The Retailer must also work closely with a Corteva Territory Manager, which would necessarily impede it from making any purchases of generic crop protection products

manufactured by generics that compete with Corteva branded products.[14] And the Retailer must submit valid grower data to Corteva consisting of an Excel data sheet reflecting purchases from it by growers.

101.    The subsequent pages in the Corteva loyalty program agreement include rebate data, *inter alia,* as follows: (1) products containing  rimsulfuron, sold under such Corteva brand names as Instigate and Matrix SG, with respective 7% or 10% rebates; (2) products containing oxamyl, sold under the brand names such as  Vydate C-LVand Vydate L, with 4% rebates; and (3) products containing acetochlor, sold under brand names such as  Keystone LA and Keystone LA NXT, Surpass NXT, Fultime, Resicore, Resolve Q, and Steadfast Q with respective rebates of 10%, 10%, 10%, 10%, 11%, and 11%.

D.    **Their Operation and Effect. Exclusive Loyalty Programs Detrimentally Affect United States Farmers**

102.    In September of 2022, the Federal Trade Commission ("FTC"), joined by multiple state Attorneys General ("AGs") filed a lawsuit against Syngenta and Corteva over these practices. *Fed Trade Comm'n, et al. v. Syngenta Crop Protection, LLC, et al*., No. 22-cv-828 (M.D.N.C. Sept. 29, 2019) ("FTC Action"). The lawsuit and the separate joinder statements of state AGs unequivocally assert that, after an extensive investigation, Corteva is engaged in a scheme to minimize generic penetration of the markets for AIs used in crop protection by bribing Retailers through incentives that ensure they will sell little, if any, generic alternatives.

103.    The consequences for farmers like the Plaintiff are significant because generic competition translates into lower retail prices for affected crop protection products; thus Plaintiffs' and farmers' income is directly negatively affected.

104.    In announcing his state's joinder in this action, the Minnesota AG stated:

---

[14] *See* Exhibit 7, Corteva 2020-2021 Retailer Offers Brochure.

To encourage innovation, companies such as Syngenta and Corteva can initially develop, patent, and register active ingredients in their products and exploit their commercial potential for several years. After those protections expire, generic manufacturers may enter the market with products with the same active ingredients and relying on the same toxicology and environmental impact studies. *This competition ordinarily leads to dramatic price reductions, benefiting farmers and consumers.* (Emphases added).[15]

105.     An op-ed piece by FTC Chair Lina Khan ("Khan"), published in the *Des Moines*

*Register* explained the issue in greater detail:

The scheme starts with patents. Companies like Syngenta and Corteva are in the business of inventing new active ingredients for pesticides. Each time they do, they get to patent that invention. A patent entitles an inventor to a 20-year period where only they are allowed to sell the invention. But there's a compromise: Once the patent expires, anyone is free to bring a generic version into the market. That's why when you have a headache, for example, you can choose between Tylenol and generic acetaminophen. When someone holds a patent they can generally charge high prices, given that nobody else can sell that product. But once the patent expires and generics come in, the original patent holder should have to compete with them, including on price.

Syngenta and Corteva weren't satisfied with this compromise. They wanted to keep raking in big profits even after the patents expired. To do that, our lawsuit alleges, each company plotted to cut farmers off from cheaper generic alternatives. In general, manufacturers don't sell pesticides directly to farmers. They sell to distributors. Syngenta and Corteva realized that these distributors were a potential choke point. So they each launched "loyalty programs" in which distributors who bought their products would receive large payments, styled as a rebate. The catch: If those middlemen distribute too many generic pesticides, they don't get the money. In other words, distributors get paid to exclude generics.

This works out the way you'd expect. Distributors don't want to miss the payments, so they go along with the program. After all, it doesn't hurt them to spend more on brand-name pesticides, because they get to pass those costs on to retailers and, ultimately, to farmers. With distributors under-stocking generics, farmers end up having little choice but to buy Syngenta and Corteva. And here is the payoff to the whole scheme: Because farmers are locked into buying their stuff, Syngenta and Corteva can keep charging inflated prices, as if their products were still under patent. The pesticide

---

[15] Minnesota AG Press Release (Sept. 30, 2022), available at https://www.ag.state.mn.us/Office/Communications/2022/09/30_SyngentaCorteva.asp (Last accessed Nov. 10, 2022).

giants can make more profits by blocking rival products from the market than by competing with them.[16]

106.    While Khan in her op-ed piece discussed Syngenta's and Corteva's arrangements with distributors, paragraphs 58-59, 76-77, 87, 96, 109, and 161 of the complaint filed in the FTC Action refer to similar arrangements with retailers.

107.    The difference in price between the branded product subject to a loyalty program and its generic substitute can be substantial; in some instances, the generic product's retail price can be 8% of the branded product's retail price.

E.    **The Manufacturer Defendants' Anticompetitive Activities Are Ongoing  And Show No Sign Of  Ceasing.**

108.    The Manufacturer Defendants and the Co-conspirator Distributors had the opportunity to discuss and coordinate their respective loyalty programs through CropLife America ("CLA"), the national trade association that represents the manufacturers, formulators and distributors of crop protection products. Only manufacturers and distributors of crop protection products are eligible for full membership in CLA. Corteva, BASF, and Sygenta are members of this trade association; a representative of Corteva formerly chaired its Board of Directors and its current chair, elected in 2022, is Paul Rea of BASF Agricultural Products Group. Coordination with respect to loyalty programs was also available through the Agricultural Retailers Association ("ARA"). That organization "advocates, influences, educates and provides services to support its members in their quest to maintain a profitable business

---

[16] Lina Khan, "Opinion: AG companies' loyalty programs unfairly extract profits from Consumers" in *Des Moines Register* (Oct. 6, 2022) (available at https://www.desmoinesregister.com/story/opinion/columnists/2022/10/06/syngenta-corteva-farmers-lawsuit-unfairly-extract-profits-from-consumers/69542239007/) (last accessed Nov. 10, 2022).

environment, adapt to a changing world and preserve their freedom to operate."[17] Current

members of the Board of ARA include representatives of Nutrien, Corteva, and Syngenta. The

CRA cooperates extensively with the ARA.

109.    Syswato Das, a spokesperson for Syngenta, has said that the loyalty programs are

part of a longstanding  "*voluntary and industry-standard program*" (emphases added) and

asserted that "[w]e are disappointed that the FTC has failed to appreciate the beneficial effects

that these rebate programs provide to our channel partners and to growers."; Kris Allen of

Corteva expressed similar views.[18] And Vern Hawkins, Syngenta's President of Crop Protection,

has taken the extreme step of accusing Lina Khan of the FTC of lying in her aforementioned op-

ed article.[19]

### F.    Relevant AIs.

**Syngenta AIs.**

110.    Syngenta's loyalty program applies to a number of Ais, of which Plaintiffs have

purchased over several years. Those Syngenta AIs that are the primary focus of this Complaint

are metolachlor (and s-Metolachlor), mesotrione, azoxystrobin, paraquat, and lambda

cyhalothrin. These are referred to collectively as the "Syngenta Relevant AI(s)"

111.    ***Metolachlor (s-Metolachlor).*** Metolachlor (which term is used herein to refer to

both the original metolachlor compound and the subsequent s-metolachlor variant, each as

---

[17] ARA, available at https://www.aradc.org/about/about-ara (last accessed Nov. 10, 2022).

[18] Margey Eckelcamp, "8 Things To Know About The FTC Suing Syngenta and Corteva" (Oct. 10, 2022) (available at https://www.thepacker.com/news/produce-crops/8-things-know-about-ftc-suing-syngenta-and-corteva) (last accessed Nov. 11, 2022).

[19] Meghan Grabner, "Syngenta Pushes Back Against  FTC Complaint" (Nov. 2, 2022) (available at https://brownfieldagnews.com/news/syngenta-pushes-back-against-ftc-complaint/) (last accessed Nov. 11, 2022).

described below) is an herbicide used on a wide variety of crops, including corn, soybeans, grain sorghum, cotton, peanuts, potatoes, vegetables, sunflowers, and sugar beets. Sales of crop protection products containing metolachlor in the United States exceeded $400 million in 2020.

112.    Syngenta's relevant patent protection for its original metolachlor expired in or about 1996. A Syngenta predecessor company developed, patented, and registered a variant of the original metolachlor, known as s-metolachlor. Syngenta's relevant patent protection for s-metolachlor and subsequent exclusive-use period for s-metolachlor expired in 2003. As noted in the 2016 Syngenta document discussed above, s-metolachlor sales by a Retailer that reached the 90% threshold were subject to a 5% incentive rebate.

113.    During the relevant period, Plaintiffs purchased the following Syngenta products containing metolachlor from Co-conspirator Defendants Nutrien and/or Helena: Boundary 6.5EC Herbicide, Sequence Herbicide, Sequence CS Herbicide, Prefix Herbicide, and Dual 8E.

114.    ***Mesotrione.*** Mesotrione is a widely used corn herbicide. Sales of crop protection products containing mesotrione in the United States exceeded $200 million in 2020. Mesotrione was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). Syngenta's relevant patent protection for mesotrione has expired.

115.    Under its loyalty program, Syngenta made exclusion payments to Co-conspirator Distributors and Retailers for their not marketing significant volumes of competing, lower-priced generic mesotrione products. As noted in the 2016 Syngenta document discussed above, Retailers who recorded 99% of branded mesotrione products could obtain a 5% loyalty rebate.

116.    Generic manufacturers have made few inroads with distributors.[20] At least two

---

[20] Syngenta also posted misleading articles on its website, indicating that generic mesotrione and other generic crop protection products were inferior to its branded mesotrione. *See* Syngenta Products Offer Benefits That Generic Products Don't, available at https://www.syngenta-

generic manufacturers delayed or terminated their planned entry into the mesotrione market due to loyalty-program concerns.[21]

117.    During the relevant period, Plaintiff purchased Halex GT Herbicide, a Syngenta product containing mesotrione, from Co-conspirator Defendants Nutrien and/or Helena..

118.    *Azoxystrobin*. Azoxystrobin is a broad-spectrum fungicide that protects a wide variety of crops from fungal diseases. It has annual global sales of over $1 billion. Sales of crop-protection products containing azoxystrobin in the United States exceeded $100 million in 2020. Azoxystrobin was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period under FIFRA has expired. As noted in the 2016 Syngenta document discussed above, azoxystrobin was subject to a 98% loyalty threshold requirement for which a Retailer could obtain a 10% rebate.

119.    During the relevant period, Plaintiffs purchased the following Syngenta products containing azoxystrobin from Co-conspirator Defendants Nutrien and/or Helena:  Quilt Fungicide, Quilt Excel, Quilt XCEL Fungicide, Quadris Top Fungicide, Quadris Top SBX, Crusermaxx Rice, Avicta Complete Corn 250, and Triviapro Fungicide.

120.    *Fomesafen.* Fomesafen is a widely used selective-applied and foliar herbicide for control of broadleaf weeds in soybeans. In 2018, approximately six million pounds of fomesafen were applied. Fomesafen was initially developed, patented, and registered with the EPA by Syngenta (including Syngenta affiliates). As noted in the discussion of the 2016 Syngenta document, fomesafen was subject to a 90% retailer support threshold for which Retailers

---

us.com/thrive/production/branded-products-over-generics.html (last accessed October 20, 2022).

[21] Plaintiffs allege these facts based upon information recently made public in the FTC Action. The names of the generic manufacturers and the details of their delayed entry to the mesotrione market are redacted from the public filing.

received a 5% rebate.

121.     ***Paraquat***. Paraquat is one of the most-widely used herbicides. It had annual global sales of over $90 million in 2021. Paraquat was initially developed, patented, and registered with the EPA by a Syngenta predecessor company. Syngenta's exclusive-use period under FIFRA has expired. As noted in the 2004 Syngenta document discussed above, paraquat was subject to a 98% loyalty threshold requirement for which a Retailer could obtain a 5% rebate.

122.     During the relevant period, Plaintiff purchased Gramoxone, a Syngenta product containing paraquat, from Co-conspirator Defendants Nutrien and/or Helena.

123.     ***Lambda Cyhalothrin***. Lambda Cyhalothrin is an agricultural pesticide. Sales of Lambda Cyhalothrin in 2020 have been estimated at $1.25 billion worldwide. Lambda Cyhalothrin was initially developed by a Syngenta predecessor company and was registered by the EPA in 1988.  Syngenta has sold and sells products containing Lambda Cyhalothrin under the names Karate® and Warrior®, among others.  Lambda Cyhalothrin was protected by patent until 2003.  As noted in the 2004 Syngenta document discussed above, Lambda Cyhalothrin was subject to an 98% loyalty threshold requirement for which a Retailer could obtain a 5% incentive payment from Syngenta.

124.     During the relevant period, Plaintiffs purchased Karate, a Syngenta product containing lambda cyhalothrin from Co-conspirator Defendants Nutrien and/or Helena.

125.     As noted in the 2016 Syngenta document discussed above, Lambda Cyhalothrin was subject to an 85% loyalty threshold in exchange for a 5% incentive payment from Syngenta.

126.     Under its loyalty program, Syngenta has made exclusion payments to Co-conspirator Distributors and Retailers for their not marketing significant volumes of competing,

lower-priced generic Syngenta Relevant AI products. As noted in the Syngenta documents discussed above, Syngenta Relevant AI sales by a Retailer that reached exceptional threshold ranges, in some cases as high as 99%, were subject to significant incentive rebates worth millions to participating co-conspirators.

127.    During the relevant time period, Syngenta's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of Syngenta's Relevant AI products. As a result, Syngenta, Co-conspirator Distributors, and Retailers have benefitted from supra-competitive prices of Syngenta Relevant AI products even though generic manufacturers introduced competing AI products in the United States after the expiration of Syngenta's Relevant AI(s) patent exclusivity. Generic products of these same AIs were priced significantly below Syngenta's existing crop protection products.

128.    Under Syngenta's loyalty programs, Co-conspirator Distributors and Retailers strictly managed their generic AI(s) open space, focused marketing on Syngenta Relevant AI products rather than generic competitors to those same AI products, and in some cases, stopped selling generic products despite customers' continued demand for lower-priced Syngenta Relevant AI products. The loyalty program ensures Co-Conspirator Distributors and Retailers sell minimal amounts of, if any, generic Syngenta Relevant AI crop protection products in exchange for loyalty rebates predicated on their not selling the same AI crop protection products made by generic producers.

129.    Syngenta's prices remain significantly above competitive levels. Syngenta's and Co-conspirator Distributor's loyalty program has resulted in higher prices for crop protection products containing each of Syngenta's Relevant AI(s) than would prevail in a competitive market.

**BASF AIs.**

130.    As noted in the BASF's 2022 "Program Summary Guide" discussed above, BASF loyalty program extends to five products, all of which are believed to be off patent.

131.    They are: (1) ***boscalid***, a broad spectrum carboxinide herbicide initially used with specialty crops and now extended to other crops such as cereals and oilseed rape; (2) ***F500***, a speedy and long-lasting effectiveness in controlling a broad range of key fungal diseases in sensitive populations in over 60 crops; (3) ***glufosinate ammonium***, one of the most widely-apploed broad spectrum herbicides, used in controlling weeds in a huge variety of worldwide crops; (4) ***imazamoz***, a selective broad spectrum herbicide used for eliminating broadleaf and grassweed, particularly in connection with soybean crops; and (5) ***pendimethalin***, a premergence and postmergence herbicide used to control grasses and broadleaf weeds. All these crop protection products are among BASF's most profitable. These five products are referred to herein as the "BASF Relevant AI(s)."

132.    During the relevant period, Plaintiffs purchased the following products containing BASF Relevant AIs: Liberty (containing the AI glufosinate); Headline Amp and Priaxor (containing the AI F500); Prowl H20 and Prowl 3.3 EC (containing the AI pendimethalin); and Beyond Herbicide (containing the AI imazamox).

133.    During the relevant time period, BASF's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of acetochlor products. As a result, BASF, Co-conspirator Distributors, and Retailers have benefitted from supra-competitive prices of acetochlor products. Generic manufacturers introduced acetochlor products in the United States after the expiration of BASF's patent exclusivity. Generic competitors to products containing the BASF Relevant AI(s) were priced lower than those products. Still, generic manufacturers have made few inroads with distributors.

134.    Under the loyalty program, Co-conspirator Distributors and Retailers strictly managed their generic acetochlor open space, focused marketing on the BASF Relevant AI products rather than generic products, and in some cases, stopped listing generic products despite customers' continued demand for lower-priced counterparts. The loyalty program ensures Co-Conspirator Distributors and Retailers sell minimal amounts of, if any, generic acetochlor crop protection products.

135.    BASF's loyalty program has deterred generic manufacturers from introducing counterparts to products containing the BASF Relevant AI(s) in the United States at all, or from offering innovative new products.

136.    BASF's prices for the BASF Relevant AI(s) and products containing them remain significantly above competitive levels. BASF's and Co-conspirator Distributor's loyalty program agreements have resulted in higher prices for crop protection products containing acetochlor than would prevail in a competitive market.

137.    BASF's prices remain significantly above competitive levels. BASF's and Co-conspirator Distributor's and Retailers' loyalty program agreements have resulted in higher prices for crop protection products containing BASF Relevant AI(s) than would prevail in a competitive market.

**Corteva's Relevant AIs.**

138.    Corteva's loyalty program applies to a number of AIs. Those Corteva AIs that are primary focus of this Complaint are oxamyl, rimsulfuron, and acetochlor (collectively referred to as the "Corteva Relevant AI(s)").

139.    ***Oxamyl***. Oxamyl is an insecticide and nematicide used primarily on cotton and potatoes, in addition to onions, apples, citrus fruits, pears, carrots, peppers, tomatoes, and

tobacco. Oxamyl was initially developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection and the exclusive-use period under FIFRA have expired.

140.    During the relevant period, Plaintiffs purchased the following Corteva products containing oxamyl from Co-conspirator Distributors Nutrien and Helena: Vydate L Insecticide/Nematicide, and Vydate C-LV Insecticide/Nematicide.

141.    **_Rimsulfuron._** Rimsulfuron is an herbicide used on crops such as fruit, tree nuts, potatoes, corn, soybeans, peanuts, and tomatoes. Rimsulfuron was originally developed, patented, and registered with the EPA by a Corteva predecessor company (DuPont). Corteva's relevant patent protection for rimsulfuron and the exclusive-use period under FIFRA expired no later than 2007.

142.    During the relevant period, Plaintiffs purchased the following Corteva products containing rimsulfuron from Co-conspirator Distributors Nutrien and Helena: Dupont Steadfast Herbicide; Dupont Steadfast Q; Resolve Q; and Leadoff.

143.    **_Acetochlor_**. Acetochlor is an herbicide that is used predominantly on corn, but also is used on cotton, soybeans, sunflowers, peanuts, potatoes, and sugarcane. Sales of crop protection products containing acetochlor in the United States exceeded $400 million in 2020.

144.    The EPA granted registration for acetochlor in 1994 to the Acetochlor Registration Partnership ("ARP"), a joint venture of basic manufacturers. The ARP continues to hold the United States registration for acetochlor; its current partners are Corteva and Bayer. Bayer manufactures acetochlor for both parties. Relevant patent protection for acetochlor has expired.

145.    Under its loyalty program, Corteva has made exclusion payments to Co-

conspirator Distributors and Retailers for their not marketing significant volumes of competing, lower-priced generic Corteva Relevant AI products. As noted in the Corteva documents discussed above, Corteva Relevant AI(s) sales by a Retailer that reached exceptional threshold ranges, in some cases as high as 105%, were subject to significant incentive rebates worth millions to participating co-conspirators.

146.    During the relevant time period, Corteva's loyalty program substantially limited and foreclosed generic manufacturers from providing effective competition in the sale of Corteva's Relevant AI products. As a result, Corteva, Co-conspirator Distributors, and Retailers have benefitted from supra-competitive prices of Corteva's Relevant AI products even though generic manufacturers introduced competing AI products in the United States after the expiration of Corteva's Relevant AI(s) patent exclusivity. Generic products of these same AIs were priced significantly below Corteva's existing crop protection products.

147.    Under Corteva's loyalty programs, Co-conspirator Distributors and Retailers strictly managed their generic AI(s) open space, focused marketing on Corteva Relevant AI products rather than generic competitors to those same AI products, and in some cases, stopped selling generic products despite customers' continued demand for lower-priced Corteva Relevant AI products. The loyalty program ensures Co-Conspirator Distributors and Retailers sell minimal amounts of, if any, generic Corteva Relevant AI crop protection products in exchange for loyalty rebates predicated on their not selling the same AI crop protection products made by generic producers.

148.    Corteva's prices remain significantly above competitive levels. Corteva's and Co-conspirator Distributor's loyalty programs have resulted in higher prices for crop protection products containing each of Corteva's Relevant AIs than would prevail in a competitive market.

## VI.   MARKET POWER AND DEFINITION

149.    The relevant geographic market is the United States. United States farmers may

not lawfully use crop protection products manufactured and labeled for use outside the United

States.

150.    Separate relevant product markets exist for Syngenta's Relevant AIs

(azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda cyhalothrin) ("the

Syngenta AIs Market"), BASF's Relevant AIs (boscalid, glufosinate, pendimethalin, F500, and

imazamox) (the "BASF AIs Market), and for Corteva's Relevant AIs (rimsulfuron, oxamyl and

acetochlor) (the "Corteva AIs Market") (collectively the Syngenta AIs Market, BASF AIs

Market and the Corteva AIs Market are referred to as the Relevant AI Market(s)").

151.    Each Manufacturer Defendant's Relevant AI Market consists of: (1) the technical-

grade or manufacturing-use of the each of the Manufacturer Defendant's Relevant AIs to be

formulated into an EPA-registered finished crop protection product for sale in the United States,

and (2) each Manufacturer Defendant's Relevant AIs as a component of an EPA-registered

finished crop protection product for sale in the United States.

152.    Each Manufacturer Defendant's Relevant AI Market is no broader than EPA-

registered crop protection products for sale in the United States that contain that Manufacturer

Defendant's Relvant AIs. Each Manufacturer Defendant's Relevant AI Market includes branded

and generic versions of each of its Relevant AIs.

153.    As to each Relevant AI, allegations herein relating to the Relevant AI Market(s)

apply to both sets of product markets described above.

154.    At all relevant times, Syngenta had monopoly power in the markets for

azoxystrobin, mesotrione, metolachlor, fonesafen, paraquat, and lambda cyhalothrin with respect

to crop protection products containing those specific Relevant AIs, because Syngenta had the power to price Relevant AIs and crop protection products containing those Relevant AIs at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as azoxystrobin, mesotrione, metolachlor, fomesafen, parquat, and lambda cyhalothrin  and crop protection products containing those Relevant AIs.

155.    At all relevant times, BASF had monopoly power for boscalid, F500, glufosinate ammonium, imazamox, and penimethalin, and with respect to crop protection products containing those specific Relevant AIs, because BASF had the power to price Relevant AIs and crop protection products containing those Relevant AIs at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as respect to the BASF Relevant AIs, and with respect to crop protection products containing those Relevant AIs.

156.    At all relevant times, Corteva had monopoly power for rimsulfuron, oxamyl, acetochlor, and with respect to crop protection products containing those specific Relevant AIs, because Corteva had the power to price Relevant AI and crop protection products containing those Relevant AI at supra-competitive levels without losing substantial sales to other products prescribed and/or used for the same purposes as respect to rimsulfuron, oxamyl, acetochlor, and with respect to crop protection products containing those Relevant AIs.

157.    During the relevant period, the Manufacturer Defendants have dominated their respective Relevant AI markets with sales of their own branded Relevant AIs and crop-protection products containing those Relevant AIs and by excluding generic competition through operation of each Defendant's loyalty program.

158.    To the extent that Plaintiffs and Class Members may be required to prove market

power circumstantially by first defining a relevant product market, Plaintiffs allege that the relevant product market is composed of each Defendant Manufacturer's Relevant AIs and crop protection products containing those Relevant AIs, both brand and generic, in all forms sold in the United States.

159.    For each Defendant Manufacturer's Relevant AI(s), other AIs are not close enough functional or economic substitutes to prevent the Manufacturer Defendants from maintaining prices of crop protection products containing their specific Relevant AIs above competitive levels.

160.    For each Defendant Manufacturer's Relevant AI(s), absent the restraints of trade imposed by the Manufacturer Defendants' loyalty programs, unconstrained competition from generic crop protection product manufacturers would have had a significant and non-transitory downward effect on prices in that specific Relevant AI(s) Market.

161.    Direct evidence of each Manufacturer Defendant's monopoly and market power includes each Defendant's ability to price its Relevant AIs and crop protection products containing those Relevant AIs above competitive levels, and to exclude competition from generic manufacturers through operation of its loyalty program.

162.    The Manufacturer Defendants have maintained and exercised the power to exclude and restrict competition to their respective Relevant AIs and crop protection products containing those Relevant AIs, which no longer had any patent protection.

163.    Each Manufacturer Defendant's monopoly power is also shown through circumstantial evidence, including dominant or substantial market shares in its relevant market with substantial barriers to entry.

164.    Potential generic manufacturers face significant capital, technical, regulatory, and

legal barriers. The Manufacturer Defendants' use of loyalty programs also imposed a substantial

barrier to entry by, among other things, limiting generic manufacturers' access to the traditional

distribution channel.

165.    Syngenta maintained dominant shares of the United States Relevant Market for its

Relevant AIs azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat, and lambda

cyhalothrin from at least 2017 through the present.

166.    BASF maintained dominant shares of the United States Relevant Market for its

Relevant AIs boscalid, F500, glufosinate ammonium, imazamoz, and pendimethalin from at least

2004 through the present.

167.    Corteva maintained dominant shares of the United States Relevant Market for its

Relevant AIs rimsulfuron, acetochlor, oxamyl. Each year from at least 2017 through the present,

Corteva maintained a substantial share of sales in each of these markets.

## VII.    ANTITRUST IMPACT AND DAMAGES TO THE CLASSES

168.    The Manufacturer Defendants' anticompetitive conduct had the following effects

in each Relevant AI market:

   a)  Competition in each Relevant AI market was reduced or eliminated;

   b)  Prices have been maintained at supra-competitive levels; and

   c)  United States purchasers have been deprived of the benefit of price

       competition, product choice, and innovation in each Relevant AI

       market.

169.    As described herein, during the Class Period, Plaintiffs directly purchased

Relevant AIs from Co-conspirator Distributors and Retailers.

170.    As a result of the Defendants' anticompetitive conduct, Plaintiffs and Members of

the Classes paid more for Relevant AIs than they otherwise would have and thus suffered substantial damages to their business or property in the form of overcharges. This is a cognizable antitrust injury and constitutes harm flowing from the affect Defendants' illegal agreements and resulting monopolization on competition under the federal antitrust laws.

171.   The Defendants' anticompetitive conduct had the purpose and effect of restraining competition unreasonably and injuring competition by protecting Manufacturer Defendants' monopoly of the Relevant AIs market(s) and limiting competition after the entry of generic Relevant AI. The Defendants' actions allowed the Manufacturer Defendants to maintain a monopoly and exclude competition in the Relevant AIs market(s) and to artificially maintain market share and prices.

172.   Through operation of the Manufacturer Defendants' loyalty program agreements, as alleged herein, generic manufacturers were discouraged from developing and marketing generic versions of the Relevant AIs, have exited the Relevant AI Market(s), and have faced an unfair competitive landscape even when they have been able to enter. But for the illegal conduct of Defendants, additional generics of Relevant AIs would have entered and captured market share.

A.   **The Manufacturer Defendants', Co-conspirator Distributors', and Retailers' Conduct Increased and Continues to Increase Prices to Farmers in the Relevant AI Market(s).**

173.   The most efficient and effective channel of distribution for each AI in the Relevant Market is the traditional distribution channel. Over ninety percent of all crop protection product sales are made through the traditional channel. A high proportion of the traditional channel participates in the Manufacturer Defendants' loyalty programs (over 80%).

174.   The Manufacturer Defendants' loyalty programs with Co-Conspirator Distributors and Retailers have high market share thresholds. Thus, these loyalty program have effectively

foreclosed generic competitors from approximately 80% or more of each Relevant AI Market from access to the traditional channel.  This practice continues and should be enjoined.

175.    The Manufacturer Defendants' loyalty programs incentivize Co-conspirator Distributors and Retailers to meet loyalty thresholds by forgoing or severely limiting purchases from generic manufacturers. Substantially all major distributors and leading retailers participate in the respective loyalty programs. Co-Conspirator Distributors and Retailers profit more when prices to farmers are higher. Their collective participation in the loyalty programs has had and continues to have the effect of maintaining higher prices to Plaintiffs and Class Members. Through Syngenta's and Corteva's respective loyalty programs, Co-Conspirator Distributors and Retailers have severely limited their purchase, promotion, and sale of generic crop protection products containing each applicable Relevant AI.

176.    To meet applicable loyalty thresholds Co-conspirator Distributors and Retailers have omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered farmers toward branded products.

177.    Through Manufacturer Defendants' respective loyalty programs, Co-Conspirator Distributors and Retailers have declined to buy or sell more than minimal amounts of crop protection products containing each applicable Relevant AI from generic manufacturers even though (1) generic products are of sufficient quality and availability; (2) generic manufacturers work to create demand for their products at the farmer and retailer levels; and (3) absent the Manufacturer Defendants' loyalty programs, demand for generic products containing each applicable Relevant AI would exceed the open space allowed under the Manufacturer Defendants' respective loyalty programs.

178.     This dynamic is so well established in the industry that it is futile for generic manufacturers to approach any large Co-conspirator Distributor or Retailer. In contrast, when selling products containing AI that are not subject to loyalty programs, generic manufacturers are able to make all or nearly all their sales through traditional-channel distributors.

179.     Generic manufacturers of crop protection products containing the applicable Relevant AI have thus been substantially foreclosed from the Relevant Markets for five years or more, to the detriment of not only the generic manufacturers but also U.S. farmers.

180.     The exclusion of generic competitors from the traditional channel harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient and effective lower-cost distribution.

181.     With respect to each Relevant AI, in the absence of the Manufacturer Defendants' and the Co-conspirator Distributors' and Retailers' mutual participation in the loyalty programs, generic manufacturers would have made significantly more sales through the traditional distribution chain. This generic competition would have increased price competition, innovation, and choice in the Relevant AI Market(s), which in turn would benefit U.S. farmers.

182.     In the absence of the Manufacturer Defendants' respective loyalty programs, sales of generic crop protection products containing active ingredients subject to the programs, including each Relevant AI, would be significantly higher and would exceed the open space allowed by the programs. Plaintiffs and US farmers would benefit from having an increased amount of lower-price generic products available in Relevant AI Market(s).

183.     In at least the azoxystrobin, mesotrione, metolachlor, fomesafen, paraquat and lambda cyhalothrin Relevant AI Markets, Syngenta further foreclosed competition through its retail loyalty program. As with the distributor program, the retail program has substantially

foreclosed generic manufacturers from efficient and effective distribution of their products, given the participation of leading retailers in the program. The same is true of the Relevant AIs for Corteva and BASF and the products containing them.

184.    The Manufacturer Defendants', Co-conspirator Distributors', and Retailers' loyalty program agreements resulted in higher prices to farmers by limiting the amount of available generic Relevant AI.

185.    The Manufacturer Defendants' respective downward price responses, and responses of prices more generally in the applicable Relevant AI Market(s), have been less significant, and slower, than they would have been absent operation of the applicable loyalty program.

186.    Defendants' anticompetitive conduct was not reasonably necessary to achieve any cognizable procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and each Defendant could reasonably achieve any procompetitive goals through less restrictive alternatives.

**B.    The Manufacturer Defendants', Co-conspirator Distributors' and Retailers' Unlawful Conduct Prevented and Continues to Prevent Generic Expansion and Caused and Continues to Cause Generic Exit from Markets.**

187.    The Manufacturer Defendants and Co-conspirator Distributors' and Retailers' loyalty program agreements have prevented, delayed, and diminished both entry and expansion of generic manufacturers of crop protection products containing the Relevant AI. The same wrongful conduct caused generic exit as to products containing the Relevant AI.

188.    Due to the competitive landscape and difficulty of entering traditional distribution chains for the Relevant AI, multiple generic manufacturers have concluded that entry is not economically feasible due to the artificial constraints created by the Manufacturer Defendants', Co-conspirator Distributors', and Retailers' loyalty program agreements. The loyalty programs

foreclosure of sales opportunities for Relevant AI led one generic manufacturer not to re-register its product in a Relevant AI market.

189.     In the absence of the Manufacturer Defendants', Co-conspirator Distributors' and Retailers' respective loyalty program agreements, generic manufacturers would compete more effectively and compete for more sales in the Relevant AI Market(s).

190.     The Manufacturer Defendants', Co-conspirator Distributors' and Retailers' loyalty programs inhibited generic manufacturers' ability to access the Relevant AI market(s) to create downward pricing pressure.

191.     The Manufacturer Defendants, Co-conspirator Distributors and Retailers together foreclosed actual or potential competitors from access to efficient and effective distribution services. With respect to the Relevant AI Market(s), this exclusion of generic competitors from the traditional distribution channel harmed the effectiveness of generic competitors by severely limiting their ability to achieve efficient, lower-cost distribution.

**C.     The Manufacturer Defendants' Co-conspirator Distributors' and Retailers' Unlawful Conduct Reduced and Continues to Reduce Available Innovative Products.**

192.     The Manufacturer Defendants' loyalty programs with Co-conspirator Distributors and Retailers reduced the ability and incentive of generic manufacturers to bring new differentiated crop protection products containing Relevant AI to market, harming innovation and restricting farmer choice.

193.     Because of the barriers to entry created by the Manufacturer Defendants' respective loyalty programs with the Co-conspirator Distributors and Retailers', generic manufacturers too often abandoned attempts to develop innovative products containing Relevant AIs. Generic manufacturers also sought to avoid using active ingredients that were subject to Defendants' loyalty programs.

194.     In the absence of the Manufacturer Defendants', Co-conspirator Distributors', and Retailers' respective loyalty program agreements, there would be more innovative products from generic manufacturers in the Relevant AI Market(s), leading to more farmer choice.

**D.     The Manufacturer Defendants', Co-conspirator Distributors', and Retailers' Unlawful Conduct Resulted and Continues to Result in Supra-Competitive Prices.**

195.     The Manufacturer Defendants' loyalty programs with Co-conspirator Distributors and Retailers have resulted in higher prices to farmers for crop protection products containing applicable Relevant AI than would prevail in competitive markets. Each Defendant's anticompetitive conduct thwarted the downward price pressure from generic manufacturers' entry and expansion, denying these generics access to efficient and effective distribution and resulting in artificially high prices.

196.     Because the loyalty programs artificially limit the availability of lower-priced generic alternatives, farmers are left to pay more for brand crop protection products containing the AI. Without the availability of cheaper, generic crop protection products in the traditional distribution channel, Plaintiffs and Members of the Class often must buy the more expensive, branded product—because the brand product is promoted and favored by the traditional distribution channel.

197.     In a competitive world where generic manufacturers can access the market for an AI, they put downward pressure on the prices of branded products containing that relevant AI. The more access generic manufacturers obtain, the more price pressure they exert. This downward price pressure affects not only lower-end brands for which generics have exact substitutes upon entry, but all products containing the AI, including higher-end mixture products.

198.     Despite access to non-traditional distribution channels in which generic manufacturers can enter and sell at low prices, the Manufacturer Defendants' loyalty programs

with Co-conspirator Distributors and Retailers limit the overall amount of available generic

product in the Relevant AI market(s) because of the traditional channels' predominance in

supply and demand chain. The limited availability of generics in the Relevant AI market(s)

allows distributors or retailers to then price generic higher than would have been possible

otherwise, thus preventing the full benefits of generic price competition from flowing to farmers.

199.    Even where generic manufacturers were able to enter a Relevant AI Market, the

Manufacturer Defendants' loyalty programs with Co-conspirator Defendants and Retailers

successfully limited the effects of this competition. The Manufacturer Defendants' respective

price responses, and responses of prices more generally in the Relevant AI Market(s), have been

less significant, and slower, than they would have been absent operation of the Manufacturer

Defendants' loyalty programs with the Co-conspirator Distributors and Retailers.

## VIII.   PLAINTIFFS AND CLASS ALLEGATIONS

200.    Plaintiffs bring this action on behalf of themselves and as a class action under the

provisions of Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of

members of the following Plaintiff Classes:

> All persons or entities in the United States that purchased azoxystrobin,
> mesotrione, metolachlor, fomesafen, paraquat or lambda cyhalothrin, or any crop
> protection product containing azoxystrobin, mesotrione, metolachlor, fomesafen,
> paraquat or lambda cyhalothrin directly from Syngenta, or any distributor or
> retailer participating in Syngenta's Loyalty Program for such active ingredients,
> beginning January 1, 2004, until the effects of the unlawful conduct cease (the
> "Syngenta Class Period");

> All persons or entities in the United States that purchased rimsulfuron or oxamyl,
> or any crop production products containing rimsulfuron or oxamyl, directly from
> Corteva or any distributor or retailer participating in Corteva's Loyalty Program
> for such active ingredients, beginning January 1, 2004, until the effects of the
> unlawful conduct cease (the "Corteva Class Period"); and

> All persons or entities in the United States that purchased boscalid, F500,
> glufosinate, imazamox, or pendimethalin, or any crop production products

containing them, directly from BASF or any distributor or retailer participating in BASF's Loyalty Program for such active ingredients, beginning January 1, 2004, until the effects of the unlawful conduct cease (the "BASF Class Period").

201.    All of these Classes seek treble damages and injunctive relief under 15 U.S.C. §§ 15 and 26.

202.    Excluded from the Classes are: (a) the Manufacturer Defendants and their subsidiaries, affiliate entities, employees, and co-conspirators (*i.e*, distributors or retailers participating in the Manufacturer Defendants' loyalty programs involving the at-issue products), (b) entities that purchased crop protection products for resale to others, and (c) all federal or state government entities or agencies.

203.    Members of the Classes are so numerous and geographically dispersed that joinder is impracticable. Further, members of the Classes are readily identifiable from information and records in Defendants' possession.

204.    Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and members of the Classes were damaged by the same wrongful conduct of Manufacturer Defendants and Co-conspirator Distributors.

205.    Plaintiffs will fairly and adequately protect and represent the interests of members of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of members of the Classes.

206.    Plaintiffs are represented by counsel with experience in the prosecution and leadership of class action antitrust and other complex litigation.

207.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would

require.

208.    Questions of law and fact common to members of the Classes predominate over questions that may affect only individual Class members, thereby making a class action with respect to members of each Class as a whole appropriate. Questions of law and fact common to Plaintiffs and members of the Classes include, but are not limited to:

a.  Whether Syngenta conspired with Co-conspirator Distributors, and Retailers to unreasonably restrain trade in violation of federal antitrust laws;

b.  Whether Corteva conspired with Co-conspirator Distributors, and Retailers to unreasonably restrain trade in violation of federal antitrust laws;

c.  Whether BASF conspired with Co-conspirator Distributors, and Retailers to unreasonably restrain trade in violation of federal antitrust laws;

d.  Whether Syngenta, Co-conspirator Distributors, and Retailers unlawfully monopolized or conspired to monopolize the Relevant AI;

e.  Whether Corteva, Co-conspirator Distributors, and Retailers unlawfully monopolized or conspired to monopolize the Relevant AI;

f.  Whether BASF, Co-conspirator Distributors, and Retailers unlawfully monopolized or conspired to monopolize the Relevant AI;

g.  The scope and duration of the alleged conspiracies;

h.  Whether Syngenta, Co-conspirator Distributors, and Retailers violated Section 3 of the Clayton Act;

i.  Whether Corteva, , Co-conspirator Distributors, and Retailers violated Section 3 of the Clayton Act;

j.  Whether BASF, Co-conspirator Distributors, and Retailers violated Section 3 of the Clayton Act;

k.  Injury suffered by Plaintiffs and members of the Classes;

l.  Injunctive relief available to the Plaintiffs and members of the Classes;

m.  Damages suffered by Plaintiffs and members of the Classes.

209.    The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be

pursued individually, substantially outweigh potential difficulties in management of this class action.

210.     Plaintiffs reserve the right to amend the definition of members of the respective Classes, including, without limitation, the Class Period.

## IX.     EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

211.     By equitable estoppel, the Manufacturer Defendants', Co-Conspirator Distributors' and Retailers' concealment of their unlawful combination and conspiracy has tolled any applicable statute of limitations for Plaintiff and the Classes with respect to any claims and rights of action that Plaintiffs and the Classes have alleged in this Complaint.

212.     Plaintiffs and the Classes were not placed on actual or constructive notice of the conspiracies alleged herein until, at the earliest, the FTC's and AGs' September 29, 2022 complaint made public its investigation into the Manufacturer Defendants' misconduct and its allegations that Manufacturer Defendants' loyalty program agreements with the Co-conspirator Distributors and Retailers restrained competition and caused higher prices, among other harms.

213.     Throughout the Class Period, the Manufacturer Defendants, Co-conspirator Distributors, and Retailers effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiffs and the Classes.

214.     The Manufacturer Defendants, Co-conspirator Distributors, and Retailers maintain and enforce strict confidentiality provisions in their agreements with one another and the conditions and descriptions of their respective loyalty programs. Distributors' contracts also contain strict confidentiality provisions, prohibiting the disclosures of prices Retailers pay to wholesalers for the Relevant AI products.

215.     The Manufacturer Defendants all publicly stated that they were in compliance

with federal laws that governed their conduct, including federal antitrust laws. Plaintiffs and Members of the Classes could and did rely on such statements and thus were misled into believing that no anticompetitive activity was occurring.

216.    For example, Syngenta says in its current Code of Conduct ("CoC")[22] at page 6 that'[a]s an industry leader, we take our responsibilities very seriously. We are transparent and responsible and comply with all applicable laws, and ensure that employees are aware of those laws relevant to those roles." At page 8 of the same document, it states that "[w]e ensure that all business practices comply with the competition law wherever business is conducted. Competition laws apply to business conduct in general and to all business arrangements, irrespective of whether they are written, oral, or in any other form."

217.    Corteva's CoC[23] states at page 12 that "[w]e conduct business ethically. Every time we represent Corteva Agriscience, it is our chance to make a positive impression. We speak with pride, honesty, and transparency about our work to promote trust, confidence, and sustainable business." At page 14 of the same document, Corteva states that it does not "interfere with our competitors' business relationships", or "[u]se our market strength or market information to unfairly harm or unlawfully prevent competition."

218.    BASF's current CoC[24] touts at page 14 that "our integrity as a company—that means living up to the spirit and the letters of the laws that govern our industry…." It adds at

---

[22] Available at https://www.syngentagroup.com/sites/syngenta-group/files/governance/code-of-conduct/syn-240-sg-coc-english-aw5.pdf (last accessed Nov. 16, 2022).

[23] Available at https://www.corteva.com/content/dam/dpagco/corteva/global/corporate/files/code-of-conduct/Corteva_Code_Interactive_enEN_English.pdf (last accessed Nov. 16, 2022).

[24] Available at https://www.basf.com/global/documents/en/news-and-media/publications/reports/2020/BASF_Code_of_Conduct_2020_EN.pdf (last accessed Nov. 16, 2022).

page 26 that "[w]e are committed to conducting our business solely on the basis of free and fair competition, and we strictly obey all applicable laws and regulations. We believe that fair, well-regulated competition strengthens our market and benefits our customers. As a market leader in various fields, BASF has special obligations under antitrust law for conducting our business in a way that promises fair competition. We welcome this extra responsibility, and aim to lead by example, to achieve the best for our customers. We are aware that any violation of antitrust laws can result in heavy fines, and even imprisonment, for the company, management and individuals concerned. It is up to all of us to be alert for any situation that could potentially be seen as harmful to free and fair competition."

219.    These promises in Defendants' respective CoCs are belied by their respective conduct set forth in this complaint. Their ultimate customers—plaintiffs here—relied on their self-professed integrity and law-abiding goals and were misled as a result.

220.    Accordingly, prior to the filing of the FTC Action, Plaintiffs and the Members of the Classes have had virtually no visibility into the Manufacturer Defendants' loyalty programs, other than those unredacted portions of the FTC's recent complaint, let alone visibility of the conspiracy to use the loyalty programs to restrain trade and maintain supra-competitive pesticide prices.

## X.    CAUSES OF ACTION

### COUNT I

### UNLAWFUL CONDITIONING OF PAYMENTS
### IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT (15 U.S.C. § 14)

221.    The Manufacturer Defendants provided payments in the form of rebates in the sale of at-issue crop protection products to Co-conspirator Distributors and Retailers in exchange for Co-conspirator Distributors' and Retailers' agreements not to use or deal in the goods of generic

competitors in accordance with the Manufacturer Defendants' loyalty programs. This conduct substantially lessened competition and created monopolies in the at-issue products in the Relevant Markets, in violation of Section 3 of the Clayton Act (15 U.S.C. § 14).

222.     As a result, generic competition in the at-issue product Relevant Markets was substantially restrained and the Manufacturer Defendants unlawfully maintained monopolies in the at-issue products, which caused the prices of the at-issue products purchased by Plaintiffs and Class Members to be higher than they would have been in the absence of the Manufacturer Defendants' agreements with Co-conspirator Distributors and Retailers.

223.     Plaintiffs and the Class Members were injured and damaged because they purchased at-issue products at supra-competitive prices caused by the Manufacturer Defendants's violations of Section 3 of the Clayton Act.

224.     Plaintiffs and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT II

### UNLAWFUL  MONOPOLIZATION
### IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. § 2)

225.     At all times relevant, Syngenta has had monopoly power in the Relevant Markets for azoxystrobin, metolachlor, s-metolachlor,  mesotrione, fomesafen, paraquat and lambda cyhalothrin At all times relevant, Corteva has had monopoly power in the Relevant Markets for rimsulfuron, acetochlor,  and oxamyl.  At all times relevant, BASF has had monopoly power in the Relevant Markets for boscalid, F500, glufosinate ammonium, imazamox, and pendimethalin

226.     The Manufacturer Defendants maintained monopoly power through a course of anticompetitive and exclusionary conduct by entering and maintaining agreements with

distributors and retailers that contain competition-limiting loyalty requirements and, among other things, enforcing and threatening enforcement of these requirements or the imposition of other penalties for insufficient loyalty in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

227.    Plaintiffs and Class Members were injured by the Manufacturer Defendants' maintaining their monopolization of the Relevant Markets for the at-issue products, which allowed Syngenta and Corteva to price the at-issue products at artificially high levels that bar or limit competitive entry. Plaintiffs and the Members of the Classes paid higher prices for the at-issue products than they would have in the absence of the Manufacturer Defendant's violations of Section 2 of the Sherman Act.

228.    Plaintiffs and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT III

## CONSPIRACY TO MONOPOLIZE (15 U.S.C. § 2)

229.    The Manufacturer Defendants individually conspired with the Co-conspirator Distributors and Retailers to unlawfully maintain the Manufacturer Defendants' monopolies in the at-issue products through anticompetitive exclusionary agreements. The Co-conspirator Distributors and Retailers intentionally facilitated the Manufacturer Defendants' efforts to illegally maintain their monopoly power in the Relevant Markets for the at-issue products by participating in the Manufacturer Defendants' loyalty programs, which were designed to and did artificially restrict generic competition, as described above.

230.    The Manufacturer Defendants', the Co-conspirator Distributors', and the Retailers' intent and goal was to maintain the Manufacturer Defendants' monopolies in the at-issue products so the Manufacturer Defendants and the Co-conspirator Distributors and Retailers

could eliminate or limit the threat from generic competition and continue to charge supra-competitive prices for the at-issue products.

231.    Plaintiffs and Class Members were injured by Manufacturer Defendants' agreements with Co-conspirator Distributors and Retailers that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of the at-issue products at artificially high levels. Plaintiffs and the Class Members paid higher prices for the at-issue products than they would have in the absence of Defendants' violations of Section 2 of the Sherman Act.

232.    Plaintiffs and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## COUNT IV

## UNREASONABLE RESTRAINTS OF TRADE
## IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)

233.    The Manufacturer Defendants entered into unlawful contracts, combinations, or conspiracies in unreasonable restraint of trade in violation of Section 1 of the Sherman Ac, 15 U.S.C. § 1 with Co-conspirator Distributors and Retailers.

234.    These agreements had the purpose and effect of restricting sales of generic versions of the at-issue products in order to preserve the Manufacturer Defendants' monopolies in the at-issue products and to artificially raise, fix, maintain, or stabilize the prices of the at-issue products.  Distributor co-conspirators and retailers agreed with the Manufacturer Defendants to essentially boycott generic versions of the at-issue products.

235.    These practices were unreasonable restraints of trade in violation of Section 1 of the Sherman Act. Even if these violations are contended not to constitute per se offenses, they are unlawful under either a "quick look" or rule of reason analysis.

236.    Plaintiffs and Class Members were injured by the Manufacturer Defendants' agreements with Co-conspirator Distributors and Retailers that unreasonably restrained trade and raised, fixed, maintained, or stabilized prices of the at-issue products at artificially high levels. Plaintiffs and the Class Members paid higher prices for the at-issue products than they would have in the absence of the Manufacturer Defendants', and Co-conspirator Distributors' and Retailers' violations of Section 1 of the Sherman Act.

237.    Plaintiffs and Class Members have no adequate remedy at law to prevent Defendants' ongoing and future anticompetitive conduct and therefore seek an injunction to prevent them from continuing with such conduct.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Classes, pray for judgment against all Defendants, jointly and severally, as follows:

1.    That the Court adjudge and decree that Defendants each have violated Sections 1 and 2 of the Sherman Act;

2.    That the Court adjudge and decree that Defendants each have violated Section 3 of the Clayton Act;

3.    That Plaintiffs and all others similarly situated be granted injunctive relief with respect to Defendants' ongoing anticompetitive conduct;

4.    That Plaintiffs and all others similarly situated be awarded damages suffered by reason of these violations and that those damages be trebled in accordance with the law;

5.    That Plaintiffs be awarded reasonable attorneys' fees and costs; and

6.    That Plaintiffs be granted such other and further relief as the Court may deem just and proper.

## XII.   DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and others similarly situated, hereby request a jury trial,

pursuant to Federal Rule of Civil Procedure 38(b), on any and all claims or issues so triable.

DATED:  November 17, 2022          Respectfully submitted,

/s/ *Scott D. Gilchrist*
Irwin B. Levin (#8786-49)
Richard E. Shevitz (#12007-49)
Scott D. Gilchrist (#16720-53)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Fax: (317) 636 2593
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com

***Local Counsel***

Michael L. Roberts (*pro hac vice* forthcoming)
mikeroberts@robertslawfirm.us
Dr. Kelly A. Rinehart (*pro hac vice* forthcoming)
kellyrinehart@robertslawfirm.us
ROBERTS LAW FIRM, PA
1920 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (501) 952-8558

Michael D. Hausfeld (*pro hac vice* forthcoming)
James J. Pizzirusso (*pro hac vice* forthcoming)
HAUSFELD LLP
888 16th St. St., N.W.
Suite300
Washington, DC 20006
(202) 540-7200 (phone)
(202) 540-7201 (fax)

Michael P. Lehmann (*pro hac vice* forthcoming)
HAUSFELD LLP
600 Montgomery St.
Suite 3200
San Francisco, CA 94111
(415) 633-1908 (phone)
(415) 633-4980 (fax)

***Counsel for Plaintiffs***